Good morning. May it please the Court, my name is Bill Kirchner and I represent Appellant Tim Blowers in this case. I would like to talk with you about two of the issues this morning, if we have time, and take them in the reverse order of what they're in in the briefs. And I'm going to try to reserve at least a few moments for rebuttal, if I can squeeze that in as well. Now, I would like to concentrate on issues number three, start with issue number three first in the briefs, and then move on to issue number one with the time that I have remaining. Issue number three concerns the complete preclusion of all bias and prejudice cross-examination and evidence against key government witness Susan Bernal in this case. Now, as this Court is aware, the situation in this case was that my client, Mr. Blowers, was a part of a neighborhood group of folks who opposed the installation of a gun range near the roads that were in question in this case, and that neighborhood group blocked the installation of this range. Ms. Bernal was the person in the BLM who was the point person to coordinate with Pima County in the installation of this range. After that effort was thwarted, the government prosecuted my client criminally for his actions, and the defense raised the issue of vindictive or selective prosecution, and that issue was litigated before the magistrate judge. Many days of hearings were held. Eventually, the magistrate judge ruled against the defense. At that point, the district judge reviewed and affirmed that ruling. After that, the prosecution requested that the defense not be allowed to put on any evidence concerning the gun range, and one of the reasons that the defense wanted to put that on was to show bias and prejudice against this key government witness. The court, having reviewed the hearings, reviewing the transcripts de novo, decided that the defense had not made out enough of a case to be allowed to present that evidence, and that, therefore, it would be a waste of the jury's time to hear that evidence. Essentially, what the judge did was to determine that he didn't believe there was bias and prejudice on Ms. Bernal's part, so he wasn't going to allow the jury to hear that evidence. That was an abuse of discretion. There is no question that decisions regarding the credibility of a witness. Kennedy. There's more to this case, it seems to me, than whether or not she was prejudiced. What you're really trying to find out is whether the government was prejudiced, that is, their selective prosecution. This is the department of what, lands and management or something? Bureau of Land Management, correct. And I haven't seen the cases that say that the prosecutor is tarred with everything that happened or has knowledge of all the other departments. How do you make that leap from whatever she knew, whatever she believed, over to the prosecutor for selective prosecution? Well, and the issue that I'm talking about this morning is actually a different issue than that. That is issue number two in our brief, so I'm more than happy to talk about that. Oh, sorry, I got on the wrong one. I'm more than happy to talk about that, and I can give you a brief answer to that. Our position is that what, and I've cited some cases in there. I'm not, I can't recall exactly what case I cited, but I've cited it in my reply brief, and essentially what our position is on that question is that when you have a witness that holds all of the knowledge about this technical area, that when she misleads a prosecutor into doing a prosecution, saying there's been $2 million worth of plant damage, and in fact there's only been $500 worth of plant damage, that that then is imputed to the government when she is essentially responsible for instituting the case. But the issue that I'm talking about here is different than the vindictive prosecution issue. The issue here is just straightforward impeachment of a witness for bias and prejudice, something that you were just talking about in the last case, and the standard for that is very different, and I think what happened here is that the trial judge seemed to have sort of confused the two standards. Obviously there's a much more technical showing that's required for a vindictive prosecution claim, or even for what we asked for, which was disclosure in a vindictive prosecution claim. It impinges upon a core executive function, and therefore the courts have trod very gingerly in this area. They have set forth a very specific test with requirements that must be met before you can get disclosure, and before you can prevail. So what the judge seemed to have done is confused that showing with what we asked to do with Susan Bernal, and that is to simply make a showing of bias and prejudice on her part, that she was prejudiced against my client for his actions in thwarting this. So this is a Rule 403 issue? Yes. That is how the judge ruled on it, as a Rule 403 issue. Then you'd have to show that that was an abuse of discretion. Yes. In terms of the Confrontation Clause issue, that is reviewed de novo, as we stated in our briefs. But when there's a complete preclusion of bias and prejudice information, then it's our position that it is an abuse of discretion. And I would refer the Court to Rule 104E of the Federal Rules of Evidence, which actually is directly on point with this. But beyond that, all of the case law says that you have to be allowed to put on evidence of bias and prejudice on the part of any given witness. Okay. Now, what are we talking about here? What exactly is the evidence? Well, the evidence would be about Ms. Bernal's involvement in putting this gun range together, in getting it to fruition, and the fact that my client and the co-defendant in this case basically thwarted that. And it was our position that she was biased and prejudiced against them, that she was angry at them for their dogged refusal to simply knuckle under to what it is that the BLM wanted to do. Essentially, by exercising their First Amendment rights, they had incurred her wrath, and that that explains why she went out and grossly exaggerated and distorted the things that she supposedly saw. I'm not sure if you have a question. Did that get before the jury? I mean, you're using a lot of adjectives. Sure. No. Adverbs. No. And I will tell the Court this. What? What exactly didn't get before the jury that shook you? Direct questions about her bias and prejudice were simply not allowed. Every time the defense tried to talk about her involvement in the gun range and how that would raise bias on her part against our client, the judge cut them off. And there are numerous citations in the brief. At one point, the judge went so far as to say, I thought I had ruled that you can't get this information in, and it doesn't sound like you've heard my ruling. The defense counsel certainly tried mightily to get this information in, that Ms. Bernal was a new government employee, a new BLM employee. She was tasked with working with the county to put in this gun range. It was obviously a political issue because the county had closed the old gun range. And so the ---- I guess I don't ---- I'm not following what that has to do with your client. Well, what it has to do with my client is that she, Ms. Bernal, was the person who gave the key testimony about how many plants were damaged and so forth. And what this shows is that she held a grudge against him. She held a grudge against him before she did these plant counts, after she did these plant counts, and when she testified. And that's something that the jury is always entitled to know. If a witness has a grudge against the defendant, the jury is entitled to know that. But doesn't the trial judge at some point in time, under 402, 403, have to make a determination as to how far afield the judge is going to allow evidence to come in on bias? Absolutely. And isn't that what happened here, is that the judge made a determination that this is going too far? No. The trial judge certainly has to make an ordinary relevance decision. And there again, you know, really what he did is apply this much more structured vindictiveness claim, which was inappropriate. But certainly he could have made an ordinary relevance decision, simply whether the evidence would have made it more likely or not. But in this case, it was clear that at least a defendant is allowed to put on enough evidence to make a record that he can argue to the jury that the witness might be biased against him. And I would analogize this situation to where you have a police officer. The jury always wants to believe the police officer and assume that the police officer is going to tell the truth. After all, this guy doesn't have a grudge against my client. He doesn't even know him. Why would the officer lie? Well, if the person does have a grudge against the client, then the jury needs to know that. They need to know that to assess this person's credibility. And it was particularly important in this case, because the information that Ms. Bernal gave was very difficult to understand. How she went out on these roads and did certain tests and counted plants and came up with numbers, most of which were wrong and were proven wrong later on in the case. But it was very difficult for the defense to directly attack that, just because the information was so hard to understand to begin with. But did you make an offer of proof as to what contacts your client had had with this person before or anything like that? Well, that was the subject of two years of pretrial litigation. So the defense did not make a specific offer of proof, but rather made an argument as to why bias and prejudice is always relevant, and he should be allowed to get that before the jury. So there are three parts to the Confrontation Clause test, which were discussed in the previous part of this ‑‑ I'm sorry, in the case previous to ours. And the first part is whether it was relevant. It was clearly relevant here because it's black letter law that it's always relevant to a case to impeach a government witness for bias and prejudice. And the second part is whether there's interests that outweigh the presentation of the evidence. And I think this might go more to your question, Judge Benitez. In this case, certainly the judge would have been well within his rights to circumscribe the evidence, to limit it in some way. If the defense wanted to go on for day after day with bias and prejudice, cross-examination and so forth, then the judge would have been within his rights to restrict that, but not to restrict it entirely. And if you look at the government's brief on this, it's very telling. There is not a single case that they have cited where the government has been ‑‑ I'm sorry, where the court has completely precluded all evidence of bias and prejudice. That's our case. And that is the violation. Do you think this is your strongest argument here? Pardon me? Do you think this is your strongest argument? Well, actually, I think issue one is our strongest argument. And I started with that second because I thought this was a shorter argument and I wanted to at least get into that. All right. This just made me better get to this. Okay. Turning to the first issue in the case, that's the issue of whether it's a due process violation for a prosecutor to suppress information that one of his key witnesses is dodging arrest warrants. In this case, had he disclosed this information, the defense also would have found that this witness who appeared to the jury to be a Boy Scout was, in fact, a crack cocaine user. He was a person who had significant mental health issues. And beyond that, he was a person who had lied to this prosecutor in this very case. We've read your brief. The problem you have with this argument is what did the government know to disclose? There isn't anything I've seen in reading the briefs other than they knew this person is living in a different state, he'd willingly come back, but he has some traffic warrants outstanding. Well, disclosing that isn't very significant for a case like this. What you're concerned about, as I understand it, is you were able to find out these other things after the trial. Why shouldn't the burden have been on the government to find them and then disclose them? Do I understand your argument correctly? I don't think that's a correct characterization, although it's very close. And I don't mean to split hairs with you. Okay, show me what you mean. What we're saying is that the government certainly knew several things that it should have disclosed to the defense. Number one, having had this giant red flag waved in front of their face that this man is dodging arrest warrants, the government should have at the very least disclosed who he was and what his testimony was so that the defense would have an opportunity to do a proper investigation. You say there was a duty to disclose this earlier than the Friday 4 trial? Yes, and the prosecutor knew about this almost a month before trial. How would the prosecutor know, for example, about the psychological problems, based on the conversation that you're saying was not disclosed? That's a good point, and the prosecutor absolutely would not know about that. And, you know, that's sort of the essence of their argument. We don't have these police reports, so we couldn't disclose them. They weren't suppressed by us. The point is, that's a red herring. We're not saying they should have disclosed those police reports. What they should have disclosed is what they knew. First of all, who this guy was, and secondly, the fact that he was dodging arrest warrants. That is something that any lawyer knows that a person is not necessarily going to be honest with him about. The fact is, in Arizona, they don't even issue arrest warrants for traffic tickets. His story didn't make sense, and this prosecutor had essentially stumbled upon an indication that there was impeachment evidence against this witness, and the prosecutor chose not to take the steps that he could have taken. And it's very important, the steps that he could have taken were much more within his power to take than with ours. We cannot simply run an NCIC check like he did. So when the prosecutor is presented with this information, he should have at least checked with NCIC to see if what his witness told him was true. Is it your position that he, prosecutor, should have turned over to you that the person's got some traffic tickets? No. What he should have turned over to us is that the person was dodging arrest warrants. That's the point. They know what they've been told. Yes. And what they've been told is there's some traffic problems and there may be warrants out on traffic. That's all they know. Correct. You call this the red flag, and yet the law is such that it's so immaterial that they don't have to disclose it. It seems to me until you get to the place the prosecutor knows more or has the burden to find out more, it's pretty hard to show the error here. Well, what that line of reasoning leads to is a signal to prosecutors that when there's a strong indication that there's impeachment witness or impeachment evidence against one of their key witnesses, and that evidence is really easily accessible to the prosecutor but not to the defense, that the prosecutor doesn't have to do anything about it. The prosecutor doesn't have to look at it. And we've cited several cases, and I would specifically mention the Perdomo and the Auten cases that are cited in our brief. They are from other circuits, but they do stand for the proposition that under some circumstances, a prosecutor does have to find prior act evidence of a key witness if he is put on a certain kind of notice. Now, the notice in those cases was different, and I think that they can be distinguished on that basis because the defense had specifically asked for that kind of evidence. In this case, the defense did make a request at the beginning of the case for Giglio evidence, which would cover this. But more recently, right before the trial, the defense didn't even know that this guy existed or what he was going to say, so they didn't make that kind of request. Our position is that what put this prosecutor on notice is that this person told him that he was doing something illegal. Can a prosecutor just ignore that and not tell that to the defense? I am worried about coming back to Arizona because I'm afraid I'll be arrested for the crimes that I have outstanding. Did he say that? Well, no. That's my characterization of what he said. I am afraid of coming back to Arizona because there are warrants out for my arrest, and the prosecutor talked to him more, and he said, well, they're just for traffic tickets. But the fact of the matter is it doesn't make sense that they're for traffic tickets. I'm sorry, Judge. Go ahead. You can finish your sentence. It doesn't make sense that they're for traffic tickets, but beyond that, any good lawyer knows that a person is not necessarily going to tell a federal prosecutor exactly what the truth is, and it was well within easy reach for them to check on this. It was extremely difficult for us to do so. Okay. I will reserve that time for rebuttal. Thank you. Good morning. Assistant U.S. Attorney George Vercoe from the District of Arizona may please the Court. Let me address the defendants' Brady claim, and that one really capsizes on all fronts. What the government knew was that Mark Anderson said that he was apprehensive about coming back to Arizona. He was living in Colorado because he had traffic tickets and there may be warrants as a result. That is not a red flag. That's not even a caution flag to the prosecutor to do any more investigation work. And I think that Mr. Kirshner's partner said it best at the hearing below as to why that would not even be a caution flag. And Mr. Nash said he, meaning Mark Anderson, he is the equivalent of a CPA or a high-level company executive in a white-collar crime case, where one assumes that there isn't a lot of background unless you do a pretty diligent investigation from a defense perspective. And I think that that's a very accurate characterization of the witnesses in this case. We're not talking about a drug case. We're not talking about a violent crime case. We're talking about people. Mr. Anderson had lived in that area. One of the witnesses was Jeannie Goodhart. She was a nurse, lived in the area. All the people were working people. Steve Nelson, radar operator, heavy machine operator. None of that stuff would put the prosecutor on any sort of notice that there was anything amiss with respect to Mr. Anderson. And the defense attorney's, I think, concession below illustrates that. And a few things that Mr. Kirshner says, that he was dodging arrest warrants, I don't think that that's a fair characterization of what was going on at all. He said that there were traffic tickets and he was apprehensive about coming back. And yet he came back. He came back to Arizona to testify at the trial without a subpoena. He came back of his own accord. Further, the defendant, Mr. Anderson, had indicated that he was going to hire a lawyer to take care of the traffic tickets. And that's certainly a logical thing that you would expect someone to do when they're now living in the Denver area instead of coming back themselves. Pick up the phone, hire a lawyer, send the person to retainer, and let them take care of the tickets. So, again, there's nothing there that would put the government on notice that there was anything amiss with respect to Mr. Anderson. Further, the prosecutor had numerous dealings with Mr. Anderson over the years. He put him in front of the grand jury twice. He went out to the scene at least once. That occurred, I think, in 98, 99, so then to 2003. And the defense owned admission that Mr. Anderson was a Boy Scout. Nothing in the record indicates that there was anything that should have raised a red flag. Traffic tickets and maybe warrants would not do it. I think Mr. Kirshner basically says that the Brady violation here occurred in the failure to disclose his name. Well, that is not a Brady violation. That is not favorable information. Your name is not favorable information. It has to be favorable information. Moreover, the information concerning Mark Anderson's police contacts were not in the government's custody or control. There were only a few. I think there were two arrests and one, two arrests for misdemeanors, and then there was one pending. That was the supposed fraud case in Green Valley. And then the rest were just his name popped up in a variety of different police reports, possibly for drug use and suicidal behavior. But that information was not known to the government at any time. And Mr. Kirshner basically says that it was simply the name. All we had to do was disclose the name, and that's not Brady material. A person's name is not going to be Brady material. And then as far as whether or not the information would have been material, which would then complete the circle and constitute a Brady violation, none of this stuff would have been admissible in court, and Judge Roll basically had ruled that. I did characterize it as a finding, and I apologize. Maybe that's not quite an accurate characterization that Judge Roll made findings on those, but they were pretty much the functional equivalent of findings, where he said none of this stuff would have made a difference. Yes, Your Honor. I just was wondering, this, just the flavor of this is that this was a pretty. I'm sorry. I didn't hear you. The flavor that comes through from the pretrial documents and the other materials in the case is that this was a pretty serious, large-scale destruction of some plant habitat and archaeological ruins or shards or some archaeological remains of some value. And the defendant got, was it a 16-day trial? It was a long trial, probably about three weeks, yes. The defendant wound up with probation? Yes. Did the, what was the sentence that the, did the government want a higher sentence? No, the government did not ask for jail, Your Honor. Okay. Just curious. Yes. All the sentences were probation, 60 months concurrent on everything, and the government, I think the prosecutor explicitly said that jail time would not be a good use of taxpayer resources in this case. A fairly large fine. Well, no, it wasn't a fine. It was restitution. I assume this had something to do with the damage that was alleged, or was it separate from that? No, it was a restitution, and there were numerous post-trial proceedings as to how much the damage was, apart from what the jury found. I think the jury could have reasonably found that it was in the $200,000 to $400,000 range. Judge Rohl finally decided, I'm going to have to step in and set a figure, and he reached, I think it was $212,000 to be split between the two defendants, Mr. Blowers and Mr. Holmes. And that's the amount he arrived at. Okay. Going back to the Brady issue, if I may, unless there's any other questions along those lines, of course I'd be happy to answer them at any time. But going back to the Brady issue, the evidence, Judge Rohl had indicated that it would not have come before the jury. And so if the evidence was not going to be admissible by definition, it could not be material under Brady standards. The stuff was 608 material at best. He could have denied it. He actually had a Fifth Amendment right even to refuse to answer the question, to answer any of those questions. And the judge had ruled that he – Judge Rohl had indicated that even if this stuff had been disclosed to me, even if Mr. Klein-Dienz had said, here, Judge Rohl, I'm going to submit it to you in camera for your own inspection, Judge Rohl says, I was not even – I would not have even released it to the defense, let alone admitted it at trial. Because there was no conviction. That was part of it, yes. There was no convictions to back up – to back it up. And so extrinsic evidence would not be allowed under dishonest acts. And he says, at my discretion, I would have kept it out under Rule 403, which was certainly – and especially in light of the allegations that you have in this case, there simply is nothing that I can see that the jury would have made a difference in the outcome of the case. The only area that did concern Judge Rohl was drug use. And the drug use in this case was not relevant to Mr. Anderson's observations. He had dealings with Mr. Blowers from roughly September 1st of 97 through January of 1998. There was no indication of any drug use by Mr. Anderson at that time at all, whether it's speculative, whether it's hearsay, whether it's double hearsay or not. No indication of any drug use during that particular timeframe. And that's really the only timeframe that would be relevant to admit the drug use. There was an affidavit from Ronald Beck saying he'd known Mr. Anderson for a long time and he's a longtime user of drugs. Well, Mr. Beck – So you would essentially then wind up having a mini-trial to find out whether or not this witness was, in fact, a drug user and whether or not the drugs would affect his observations. Exactly, Your Honor. And that's why Judge Rohl indicated that – and I think at one point he even indicated, what happens if we started doing this with every witness? The trial would never end. We would have a mini-trial after mini-trial going after the drug use. And especially since, in any event, there was nothing in the record indicating drug use during the timeframe in question, from September of 97 through January of 1998. The defendant in his brief points out that Mr. Anderson was such a key witness. He was an important witness, and the government certainly acknowledges that, but he wasn't the only witness. As far as whether or not Mr. Blowers was a concerned environmentalist and whether or not he would have cut a live mesquite tree, there was plenty of evidence that the trees had been downed. I included in the supplemental excerpts of record a number of pictures of damaged trees. Also, there is an inventory list that goes through and lists all the trees that were damaged during the course of the grading that took place by Mr. Blowers and Mr. Holmes. In addition, there was also the testimony on his intent, and to Jeannie Goodhart, and also there was 404B evidence that came from Debbie Rice, that Mr. Blowers had done the same exact thing in 1993, albeit on state land in Pinell County, Arizona. The defendant graded roads. He knocked down a dike that was on state land, and he did so in order to provide access for his clients who were driving Cadillacs and Mercedes, and that was 404B evidence from Debbie Rice. It's in the supplemental excerpts of record, and it was admitted for various reasons but specifically to prove his intent. So the claim that Mr. Anderson was so important for intent and for I think the other thing was how high the berms were on the side of the road is simply belied by the record. Let me address the bias issue just briefly. Judge Rohl had every right to preclude the defendant from cross-examining Ms. Bernal in this fashion. The district court judge acts as the gatekeeper, and he was in a very, very unique position because he had transcripts from the selective prosecution hearing, which Mr. Rohl- Let me interrupt you for just a second. I assume you would agree that under Larson, if you foreclose cross-examination on an entire area, our standard of review is de novo. No, I do not. I think, Judge, it would have to be abusive discretion because he was precluding it under 403. And moreover, yes, Your Honor, I'm sorry. Were you about to say something? No, that's fine. I think it would be abusive discretion standard, not a de novo standard. But even under a de novo standard, there was simply no evidence. Judge Rohl was in the unique position of having reviewed numerous transcripts. The selective prosecution hearing in which Bernal supposedly imposed her will upon the United States Attorney's Office to prosecute these two defendants, that took place over several hearings in 2002. And they could not establish a thing. And I think Judge Rohl even said that there's not a shred of evidence that you have showing any sort of bias by Bernal. That would have been a complete waste of time. It would have distracted the jury from the central issues in the case, namely whether or not the defendants were guilty or not guilty. Where is this property in relation to Tucson? It is just south of Tucson. It's actually San Xavier Mission. It would be south of there. It's near Suareta and Green Valley. Okay. It would be a little bit on the east. It would be west of I-19, Your Honor. So the judge, as the gatekeeper, had every right to preclude the evidence. And keep in mind also about Susan Bernal. She was a realty specialist. She had no law enforcement powers. She was basically, and I don't mean to be disparaging of her or anyone else in that position, but she was essentially a GS, seven- or eight-level bureaucrat. She was a realty specialist. She had no powers whatsoever, no law enforcement powers, and there was not a shred of evidence that she imposed her will upon us, or BLM, in order to initiate this prosecution. Unless the Court has any questions on any other area that I have, either on the Brady, on the bias, or any of the other claims. There don't appear to be any. The government would ask the Court to affirm the conviction. Thank you very much. Taking these in reverse order, first of all, there's the statement that there was not a shred of evidence. There was evidence. This is not something that is up to the trial court to decide. It's up to the jury to decide whether the evidence shows that the witness is biased or not, and that is something that should have been left up to the jury. Second of all, the government talks about whether there were other witnesses to intent, and I think the government is overlooking the distinction between intent and willfulness. Mr. Anderson, and sorry to switch issues there on you, but we're on Mr. Anderson now, and he was the only witness who claimed to have witnessed a confession by Mr. Blowers to Sienter, which was a key element of the government's case. The government mentioned a list of all the trees that were down. That was a list that was prepared by Ms. Bernal. It just goes to show how important she was. She was the only witness to the number of trees that were supposedly taken out, which was vastly inflated, and she was the only witness to the value, which was a key element of the offense. The discussion before talked about whether we would have to have a mini-trial about whether there was bias and prejudice on the part of these witnesses. And our point is that we at least get to ask the questions. We should ask the questions. Well, but if I understand this, the magistrate judge held a rather lengthy hearing on the question of Bernal's possible bias and whether this was selective prosecution and said that there isn't any evidence, that nothing has been this big before, that there's no evidence that she was motivated by any bias and that the district court adopted all of that. I guess I'm just not understanding the unfairness or what the district court should have done differently. Well, the unfairness is this. The magistrate judge was ruling on a vindictiveness claim. She didn't feel that we had made out the technical elements of that. But that is different than bias and prejudice, and we get to show that this witness was not somebody who didn't know these folks from Adam. You know, they say she's just a bureaucrat. I understand. I understand your position. I mean, she's a critical bureaucrat, and I would like to just touch base on a couple more, or if I might. Your time has expired. I'm sorry. Thank you very much. Thank you. Case just argued is submitted for decision, and that concludes the court's calendar for this morning. The court stands adjourned. All rise. This court in this session stands adjourned. Thank you.
judges: Wallace, Schroeder, Benitez